UNITED STATES DISTRICT COURT
DISTRICT OF MINNESOTA

---

JJ Holand Limited,                                    Civil No. 3:12cv3064

                        Plaintiff,
                                                      **COMPLAINT**

vs.
                                                      **Jury Trial Demanded**

Fredrikson & Byron, P.A.,
Dean R. Karau, and David C. West,

                        Defendants.

---

For its Complaint, Plaintiff JJ Holand Limited, by and through its undersigned counsel, hereby states and alleges as follows:

## The Parties

1.      That at all material times, Plaintiff JJ Holland Limited (hereinafter "JJH") is a company registered under the laws of the British Virgin Islands, with its principal place of business located in London, England and, after 2006, Bangkok, Thailand.

2.      That Defendant Fredrikson & Byron, P.A. (hereinafter "F&B") is a professional association engaged in the practice of law with its principal place of business located in Minneapolis, Minnesota.

3.      That Defendant Dean R. Karau ("Karau") is a duly licensed attorney who resides in Minnesota, and was, at all material times, a shareholder at F&B.

4.      That Defendant David C. West ("West") is a duly licensed attorney who resides in Minnesota, and was, at all material times, a shareholder at F&B.

## Jurisdiction and Venue

5.      That this Court has jurisdiction over this action pursuant to diversity of citizenship, 28 U.S.C. § 1332.  Plaintiff is foreign corporation, and Defendants are citizens of Minnesota and maintain a principal place of business in Minnesota.  The amount of damage is in excess of $75,000.

6.      That this Court has jurisdiction over this action pursuant to 28 U.S.C. § 1338, as part of the underlying action arose under an Act of Congress related to trademarks and other Federal law.

7.      That venue in the District of Minnesota is proper as Defendants reside in Minnesota and the facts alleged below primarily occurred in Minnesota.

## Factual Allegations

8.      That prior to 2000, JJH had an existing attorney-client relationship with F&B on trademark matters.

9.      That in 2000, JJH entered into an attorney-client relationship with F&B for input, advice, and legal representation in registering the "YES" trademark (the "YES" trademark was later amended to "YES!"; hereinafter

"YES!") in the United States for five categories of goods: cigarettes, tobacco, cigars, snuff, and smoker's articles.

10.     That on or before February 3, 2000, West prepared and sent to JJH requesting its signature, an "intent to use basis" Trademark Application for the "YES!" trademark listing twenty-one goods: tobacco, tobacco pouches, cigars, cigar cutters, cigar tubes, cigarettes, matches, cigarette lighters not of precious metal, flints for lighters, ashtrays not of precious metal, cigarette cases not of precious metal, cigarette holders not of precious metal, cigarette papers, pocket machines for rolling cigarettes, cigarillos, humidors, smoking pipes, smoking pipe cleaners, snuff, snuff boxes not of precious metal, and tobacco spittoons ("the Application"). **Exhibit A.**

11.     That based upon the advice and recommendation of F&B, JJH signed the Application, and it was filed with the United States Patent and Trademark Office by F&B on February 22, 2000. **Exhibit B.**

12.     That as the Application moved through the publication process, F&B advised JJH that it should proceed to use the mark in order to complete registration.

13.     That beginning in March 2001, JJH inquired of F&B as to what constitutes "use" for purposes of registration under United States law.

14.     That F&B responded to JJH on May 9, 2001 by advising that JJH must begin verifiable sales of its tobacco products to its U.S. customers. **Exhibit C.**

15.     That JJH inquired of F&B whether shipment of one case containing 10,000 cigarettes (500 packs) to the U.S. for sale to U.S. customers would be sufficient use according to F&B's May 9, 2011 advice. F&B confirmed on May 12, 2001 that the volume of goods would be satisfactory in regard to the use requirements under U.S. trademark law, but remained silent on whether this satisfied the number of goods identified in the Notice of Allowance. **Exhibit D**.

16.     That from May 2001 to June 2002, JJH worked on product development so that it could comply with the use requirements as advised by F&B for registering the "YES!" trademark.

17.     That on June 5, 2002, Potomac Tobacco Company ("Potomac") contacted JJH by letter stating they were seeking to register the same "YES!" trademark in the United States and informed JJH that Potomac intended to take action against JJH and its application for the "YES!" trademark.

18.     That JJH, via correspondence from its London counsel, informed F&B of Potomac's letter and requested advice on how to proceed. Mr. West responded by stating that F&B would make sure they have proper evidence of

JJH's use of the "YES!" trademark in the United States so that Potomac could not attack the registration on the basis of use.  **Exhibit E.**

19.     That JJH used the "YES!" trademark in accordance with F&B's May 9, 2001 and May 12, 2001 advice by shipping cigarettes to the United States and selling them.

20.     That as proof of its use of the "YES!" trademark on one product, JJH provided invoices and sample packaging for cigarettes as requested to F&B, which made it clear to F&B that JJH had use of the trademark on only one good.

21.     That from June 2002 to August 2003, JJH was led to believe by F&B that it was in compliance with the requirements for registering the "YES!" trademark.

22.     That on July 14, 2003 Mr. West prepared the Statement of Use for JJH's signature, which affirmed use of the "YES" mark on or in connection with those goods identified in the Notice of Allowance, and advised JJH to sign and return said Statement of Use to F&B for filing.  On the Statement of Use, Mr. West listed the date of first use of the mark in Commerce as May 29, 2003.

23.     That based upon the advice of F&B, JJH signed the Statement of Use on July 21, 2003 and it was filed by F&B on August 14, 2003.  **Exhibit F.**

24.     That on various dates in 2003 and 2004, F&B prepared and sent Cease and Desist Infringement Notices to Potomac in order to deter Potomac from infringing upon JJH's "YES!" trademark.

25.     That on March 19, 2004 Potomac responded to JJH's registration of the "YES!" trademark and Cease and Desist Infringement Notices by filing a Petition to Cancel JJH's registration of the "YES!" trademark at the Trademark Trials and Appeals Board on the basis of fraud.  **Exhibit G**.

26.     That F&B attorney Karau was assigned to lead the litigation defense of the Petition to Cancel.

27.     That on May 26, 2004 Mr. Karau advised JJH that he had reviewed the allegations in the Petition to Cancel and that the Statement of Use prepared by F&B was appropriate in all respects.  He further advised that JJH did not need to have used the mark on all 21 goods listed in its Application in order to obtain registration.  Rather, JJH only needed to aver to use of the mark in connection with one of the goods.  **Exhibit H.**

28.     That on June 1, 2004, Mr. Karau prepared and filed an Answer to Potomac's Petition to Cancel, arguing that Potomac lacked a basis upon which relief could be granted.  That Mr. Karau continued to advise JJH that as long as it

had use on one good listed in the Application it should prevail in the Petition to Cancel litigation.

29.     That on Friday, October 22, 2004, Mr. Karau reviewed his prior advice, called JJH, and informed JJH that F&B had recently undertaken legal research and, based upon that research, he was revising his earlier advice on Potomac's Petition, and he was now of the view that the Petition had strong likelihood of success, and that JJH's "YES!" trademark would likely be cancelled.

30.     That during the October 22, 2004 phone call Mr. Karau admitted that that the Statement of Use F&B prepared with respect to "YES!" should have excepted every item in Class 34 which was not then in use—every good but cigarettes.

31.     That during the October 22, 2004 phone call Mr. Karau stated that attorney "inadvertence" or "attorney error" was not a defense.

32.     That on Monday October 25, 2004, JJH confirmed via email the Friday, October 22, 2004 phone call and asked a series of pertinent questions. **Exhibit I**.

33.     That F&B encouraged JJH to settle with Potomac for whatever it could recover.

34.     That the attorneys' fees paid to F&B from 2000 to November 1, 2004 related to the "YES!" trademark were in excess of $20,000.

35.     That in late December 2004, F&B proposed, among other things, to waive its fees for its handling of the Potomac Petition to Cancel plus future legal fees to resolve the Potomac matter.  A discussion of F&B refunding prior fees paid by JJH also occurred.  **Exhibit J**.

36.     That no successful settlement negotiations proceeded between JJH, represented by F&B, and Potomac.

37.     That on May 31, 2005 F&B notified JJH that F&B intended to withdraw from representation of JJH.

38.     That on August 23, 2005 F&B sent a proposal in which in essence JJH was to release F&B from any and all claims it may have against F&B in exchange for F&B's waiver of unpaid fees, payment of a small sum of money and F&B's effort to secure a quick settlement with Potomac.  JJH did not accept this release of liability with F&B.

39.     That on September 16, 2005, as an alternative to withdrawal, F&B suggested that JJH terminate F&B.  At this time, F&B sent JJH the Motion to Withdraw it intended to file with the Trademark Trials and Appeals Board if JJH did not terminate F&B within four days.  **Exhibit K**.

40.     That in the Motion to Withdraw, F&B maintained that it was not appropriate for JJH to continue the litigation.  The draft Motion also contained a falsehood that JJH had refused to pay for ongoing representation.  In fact, F&B had offered to waive additional compensation due to its prior actions and inactions in causing JJH's unleveraged position.

41.     That the Motion to Withdraw also contained a falsehood that all papers and property related to the proceeding were in the possession of JJH or its London-based counsel.  For example, as set forth *infra*, F&B never disclosed the June 9, 2004 legal memorandum which clearly sets forth the total weakness of JJH's position in prevailing over Potomac.  This undisclosed memorandum is in direct conflict with Mr. Karau's May 26, 2004 advice.

42.     That, believing it had no choice and being unaware of the June 9, 2004 legal memorandum, on September 19, 2005 JJH terminated F&B in order to prevent the Motion to Withdraw from being filed.

43.     That on November 9, 2005 JJH secured alternate counsel for the Potomac litigation—Arash Samadani of Samadani Law, APC.

44.     That F&B was instructed to turn over all of its files on "YES!" to substitute counsel Samadani and is required to do so under the Rules of the Trademark Trials and Appeals Board.

45.     That on November 18, 2005 F&B sent an incomplete set of their files to Samadani.

46.     That F&B claimed in its correspondence to JJH that it complied with the instructions and sent all files related to "YES!", and F&B indicated to Samadani in correspondence that the files were complete.

47.     That after reviewing the incomplete file set sent by F&B, Samadani advised JJH that due to listing of 21 separate goods in its Application and only using one of the goods listed, and then certifying that it had used all 21 goods, it would not likely prevail in the cancellation proceeding with Potomac, and it would cost at least $50,000 to defend a case that they could not win.

48.     That on December 14, 2006 a default judgment was entered against JJH in the litigation, and the "YES!" trademark was cancelled.

49.     That on October 18, 2010, after repeated requests, F&B turned over additional files in the "YES!" file to JJH.  These documents included a June 9, 2004 memorandum which had been withheld from JJH, and which had been withheld from successor counsel Samadani.  This June 9, 2004 memorandum, which was prepared a few days after the Answer was filed by F&B, states that, "[o]nly 1 case in the last 10 years supports our position."

## <u>COUNT I—Legal Malpractice/Negligence</u>

50.     Plaintiff re-alleges the foregoing paragraphs as though fully restated herein.

51.     That at all times material herein, there was an attorney-client relationship between Plaintiff and Defendants as Plaintiff sought and received direct legal advice from Defendants in circumstances in which a reasonable person would rely on the advice when Defendants advised Plaintiff, drafted documents, and prepared the Application for the trademark and the Statement of Use.

52.     That Defendants could have reasonably anticipated that, under the circumstances, Plaintiff would rely on their advice.

53.     That Plaintiff was the direct and intended beneficiary of the Defendants' services.

54.     That Plaintiff reasonably relied on the legal advice provided by Defendants to its detriment.

55.     That Plaintiff's sole purpose for retaining Defendants was for the benefit of Plaintiff.

56.     That at the time Plaintiff retained Defendants it did not possess any expertise in legal matters, and relied upon Defendants to competently represent

its legal interests in good faith, and with undivided loyalty in their paid fiduciary capacity.

57.    That Plaintiff relied on Defendants' express and implied representations and innocently trusted their legal advice.

58.    That Plaintiff paid in excess of $20,000 in legal fees as a result of Defendants' representation of Plaintiff.

59.    That Plaintiff further relied upon Defendants to thoroughly investigate the facts and to protect its rights in accordance with its wishes, and with the law.

60.    That, by undertaking the role as attorneys, Defendants had a duty to represent Plaintiff's legal interests thoroughly and competently, taking whatever steps necessary as competent lawyers to investigate, analyze, and fully determine Plaintiff's legal rights and entitlement.

61.    That Defendants were negligent and breached the duty of care, including, but not limited to, the following:

a.    Failure to disclose all material matters so that JJH could make informed decisions;

b.    Advising Plaintiff that use of one good on the Application would constitute use for purposes of completing registration of the trademark;

c.      Failing to advise Plaintiff that United States trademark law requires a genuine intent to use the mark on every good listed on the Application;

d.      Failing to advise Plaintiff that the Statement of Use form requires use of all goods listed in the Application, or an identification of goods to be deleted from the Application, or splitting the application, allowing the registration to be completed on the used goods and holding the other goods for use within the time limit;

e.      Preparing and filing the Statement of Use form affirming that Plaintiff used those goods identified in the Notice of Allowance after Plaintiff had provided to Defendants proof of use of only one good identified on the notice of allowance and advising Plaintiff to sign said Statement of Use form;

f.      Advising Plaintiff that Potomac did not have a viable attack on Plaintiff's trademark on the basis of fraud even though Plaintiff had only used the mark on one good;

g.      Failing to advise Plaintiff that the holdings in applicable case law required use of all goods identified on the Notice of Allowance in order for the trademark to be registered without fraud;

h.      Failing to advise Plaintiff that the holdings in recent applicable case law did not require intent on the part of the registrant to commit fraud upon the United States Patent and Trade Office in order to find fraud in the registration of a trademark;

i.      Failing to keep the client informed of all pertinent research performed by the firm so that informed decisions could be made;

j.      Failing to inform the Trademark Trials and Appeals Board and argue to the Trademark Trials and Appeals Board  that F&B's errors in the preparation of the Statement of Use, and incorrect advice regarding use, which enabled Potomac to file its Petition to Cancel, should not be deemed fraudulent by JJH;

k.   Requiring that Plaintiff terminate its attorney-client relationship with Defendants and release all claims in order to prevent their Motion to Withdraw from being filed;

l.   Failing to timely provide Plaintiff's entire case file to successor counsel;

m.   Failing to disclose until 2010 that on June 9, 2004 an employee of F&B completed a research memorandum stating that, "[o]nly 1 case in the last 10 years supports our position while all in the last year go against us," referring to F&B's argument that use of one good on an application is sufficient; and

n.   Withholding key portions of the case file from Plaintiff until October 2010.

62.   That, as a direct and proximate result of the Defendants' negligence and breaches of the standard of care, the Plaintiff has sustained legal damages, and may sustain legal damages in the future, including, but not limited to:

a.   But-for the negligent acts of Defendants, Potomac would not have obtained a default judgment against Plaintiff on December 14, 2006, Plaintiff's trademark would not have been cancelled resulting in the lost value of the trademark, and in a sum loss in sales of products using that trademark which is estimated at a minimum loss of profits of $30,000 per month since 2006; and

b.   But-for the negligent acts of Defendants, Plaintiff would not have sustained direct and consequential monetary damages in excess of $75,000.

## <u>COUNT II—Breach of Contract</u>

63.     Plaintiff re-alleges the foregoing paragraphs as though fully restated herein.

64.     That, Plaintiff entered into a contract with Defendants for Defendants to provide competent and adequate legal assistance to Plaintiff and, in exchange, Plaintiff would pay Defendants attorney's fees.

65.     That Plaintiff was the foreseeable direct and intended third-party beneficiary of Defendants' services and commitments to achieve specific results.

66.     That Plaintiff paid in excess of $20,000 in legal fees as a result of Defendants' representation of Plaintiff.

67.     That Defendants breached its contract with Plaintiff including, but not limited to, the following:

a.      Failure to disclose all material matters so that JJH could make informed decisions;

b.      Advising Plaintiff that use of one good on the Application would constitute use for purposes of completing registration of the trademark;

c.      Failing to advise Plaintiff that United States trademark law requires a genuine intent to use the mark on every good listed on the Application;

d.  Failing to advise Plaintiff that the Statement of Use form requires use of all goods listed in the Application, or an identification of goods to be deleted from the Application, or splitting the application, allowing the registration to be completed on the used goods and holding the other goods for use within the time limit;

e.  Preparing and filing the Statement of Use form affirming that Plaintiff used those goods identified in the Notice of Allowance after Plaintiff had provided to Defendants proof of use of only one good identified on the notice of allowance and advising Plaintiff to sign said Statement of Use form;

f.  Advising Plaintiff that Potomac did not have a viable attack on Plaintiff's trademark on the basis of fraud even though Plaintiff had only used the mark on one good;

g.  Failing to advise Plaintiff that the holdings in applicable case law required use of all goods identified on the Notice of Allowance in order for the trademark to be registered without fraud;

h.  Failing to advise Plaintiff that the holdings in recent applicable case law did not require intent on the part of the registrant to commit fraud upon the United States Patent and Trade Office in order to find fraud in the registration of a trademark;

i.  Failing to keep the client informed of all pertinent research performed by the firm so that informed decisions could be made;

j.  Failing to inform the Trademark Trials and Appeals Board and argue to the Trademark Trials and Appeals Board that F&B's errors in the preparation of the Statement of Use, and incorrect advice regarding use, which enabled Potomac to file its Petition to Cancel, should not be deemed fraudulent by JJH;

k.  Requiring that Plaintiff terminate its attorney-client relationship with Defendants and release all claims in order to prevent their Motion to Withdraw from being filed;

l.     Failing to timely provide Plaintiff's entire case file to successor counsel;

m.    Failing to disclose until 2010 that on June 9, 2004 an employee of F&B completed a research memorandum stating that, "[o]nly 1 case in the last 10 years supports our position while all in the last year go against us," referring to F&B's argument that use of one good on an application is sufficient; and

n.     Withholding key portions of the case file from Plaintiff until October 2010.

68.    That as a direct and proximate result of the Defendants' breaches of the contract, the Plaintiff has sustained legal damages, including, but not limited

a.     But-for the negligent acts of Defendants, Potomac would not have obtained a default judgment against Plaintiff on December 14, 2006, Plaintiff's trademark would not have been cancelled resulting in the lost value of the trademark, and in a sum loss in sales of products using that trademark which is estimated at a minimum loss of profits of $30,000 per month since 2006; and

b.     But-for the negligent acts of Defendants, Plaintiff would not have sustained direct and consequential monetary damages in excess of $75,000.

## COUNT III—Breach of Fiduciary Duty

69.    Plaintiff re-alleges the foregoing paragraphs as though fully restated herein.

70.     That Defendants, as attorneys representing Plaintiff as a fiduciary, had a duty to represent Plaintiff in good faith and with undivided loyalty in their best legal interests.

71.     That Defendants, as fiduciaries, had a duty to disclose any material matter which pertained to Plaintiff's claim and engage in efforts which would not prejudice their client.

72.     That, as set forth above, Defendants breached their fiduciary obligations.

73.     That as a direct and proximate result of the above mentioned breaches of Defendants' fiduciary obligations Plaintiff is entitled to any and all damages awarded by the Court as just and proper.

## COUNT IV — Negligent Misrepresentation

74.     Plaintiff re-alleges the foregoing paragraphs as though fully restated herein.

75.     That Defendants made the following, but not limited to, affirmative representations, and/or representations by silence:

a.     That filing the Application and Statement of Use forms as prepared by Defendants would be in the best interest of the client; and

b.     That the Statement of Use form did not require use of all goods listed on the Application.

      c.        That Plaintiff's trademark would not be vulnerable to cancellation by the Trademark Trial and Appeals Board on the basis of fraud.

      d.        That the Statement of Use was appropriate in all respects, even when confronted with the allegations of the Potomac Petition to Cancel.

      e.        That JJH's best resolution of the cancellation proceeding was to settle the matter with Potomac.

      f.        That the Motion to Withdraw drafted by F&B was factually accurate and reflected appropriate grounds for attorney withdrawal.

      g.        That all files, materials and information related to the "YES!" trademark being requested of F&B had been sent to Samadani.

76.      That the above representations by Defendants were false representations.

77.      That the above representations by Defendants dealt with past or present facts.

78.      That the above representations by Defendants were material facts.

79.      That the above representations were made to guide Plaintiff in the course of Defendants' profession.

80.      That the above representations by Defendants were made as of the party's own knowledge without knowing whether it was true or false.

81.      That Defendants failed to use reasonable care or competence in obtaining the information or communicating it to Plaintiff.

82.     That the above representations by Defendants were made with an intent to have Plaintiff rely upon the representations.

83.     That the above representations by Defendants were made positively without qualification, in conscious ignorance of the truth, and with such heedlessness and reckless disregard of their consequence, that it had the effect of deliberate intention.

84.     That the above representations by Defendants induced Plaintiff to act or rely to their detriment.

85.     That the above representations proximately caused Plaintiffs to suffer damage in amount in excess of $75,000.

## COUNT V—Intentional Misrepresentation

86.     Plaintiff re-alleges the foregoing paragraphs as though fully restated herein.

87.     That Defendants made the following, but not limited to, affirmative representations, and/or representations by silence:

a.     That the Motion to Withdraw drafted by F&B was factually accurate and reflected appropriate grounds for attorney withdrawal.

b.     That all files, materials and information related to the "YES!" trademark being requested of F&B had been sent to Samadani.

88.     That the above representations by Defendants were false representations.

89.     That the above representations by Defendants dealt with past or present facts.

90.     That the above representations by Defendants were material facts.

91.     That the above representations were made to guide Plaintiff in the course of Defendants' profession.

92.     That the above representations by Defendants were made knowing they was false or without knowing whether they were true or false.

93.     That the above representations by Defendants were made with an intent to have Plaintiff rely upon the representations.

94.     That the above representations by Defendants induced Plaintiff to act or rely to their detriment.

95.     That the above representations proximately caused Plaintiffs to suffer damage in amount in excess of $75,000.

WHEREFORE, Plaintiff JJ Holand Limited prays for judgment of the Court against the Defendants for the following relief:

1.      Monetary damages against David C. West, Dean R. Karau, and Fredrikson & Byron, P.A.;

2.      Reasonable costs, and disbursements;

3.      For such other relief as the Court deems just and equitable.

> The undersigned certifies that sanctions may be imposed for violation of Minn. Stat. § 549.211, subd. 2.

Dated:  December 6, 2012                        _____s/Patrick H. O'Neill, Jr._____
                                               Patrick H. O'Neill, Jr. (#0207950)
                                               **O'NEILL & MURPHY, LLP**
                                               332 Minnesota Street, Ste. W2600
                                               Saint Paul, MN 55101-1359
                                               (651) 292-8100 | Fax: (651) 292-8111

                                               **Attorneys for Plaintiff**