## UNITED STATES DISTRICT COURT
## DISTRICT OF MINNESOTA

JJ Holand Limited,

                    Plaintiff,

      v.

Fredrikson & Byron, P.A.,
Dean R. Karau, and David C. West,

                Defendants.

**MEMORANDUM OPINION
AND ORDER**
Civil No. 12-3064 ADM/TNL

_____

Patrick H. O'Neill, Jr., Esq., and Patrick J. Boley, Esq., Larson King, LLP, Saint Paul, MN, on behalf of Plaintiff.

David R. Marshall, Esq., and Leah C. Janus, Esq., Fredrikson & Byron, P.A., Minneapolis, MN; and Kevin P. Hickey, Esq., Bassford Remele, PA, Minneapolis, MN, on behalf of Defendants.

_____

## I.  INTRODUCTION

On August 20, 2014, the undersigned United States District Judge heard oral argument on Defendants Dean R. Karau, David C. West, and Fredrikson & Byron, P.A.'s ("Fredrikson") Motion for Summary Judgment [Docket No. 105]. Plaintiff JJ Holand Limited ("JJH") opposes the motion. Also before the court is JJH's Objection [Docket No. 128] to Magistrate Judge Tony N. Leung's Order [Docket No. 111] dated July 17, 2014. For the reasons stated below, Defendants' motion is granted and Plaintiff's objection is overruled.

## II.  BACKGROUND

Almost 15 years ago, in December 1999, JJH retained Fredrikson's legal assistance in establishing the trademark "YES!" (or, the "Trademark") pursuant to United States law for JJH's cigarettes and other tobacco related products. Following a challenge from another company on the basis of fraud, JJH's Trademark was cancelled on December 14, 2006. Approximately six

years later, JJH filed this lawsuit against Fredrikson, alleging multiple counts of legal

malpractice.  Compl. [Docket No. 1].

## A.  The Parties

Fredrikson is a law firm with its principal office in Minneapolis, Minnesota.  David West

and Dean Karau are attorneys practicing with Fredrikson.  West represented JJH in the

Trademark application, and Karau represented JJH later in the process.

JJH is a British Virgin Islands entity with a mailing address in Bangkok, Thailand.  Janus

Decl. [Docket No. 108] Attach. 1, Ex. A ("McCulloch Dep.") at 82:13-19.  Keith McCulloch

owned JJH during the time of Fredrikson's representation.  JJH was operated by McCulloch and

Ian Hoskins, both of whom claim to have been independent contractors.  Id. at 69:23-70:3.

McCulloch structured JJH to be owned by a trust located in the Bailiwick of Guernsey.  Id. at

57:21-58:3.  Because JJH was owned by a Guernsey trust, Guernsey-based trustees were the only

individuals with the legal authority to sign documents on behalf of the company.  Id. at

131:23-132:15.  Wedlake Bell, a United Kingdom based law firm, also served as counsel for

JJH.  Wedlake Bell attorney David Harry served as director of JJH but was not involved in JJH's

day-to-day operations.  Janus Decl., Attach. 2, Ex. C ("Harry Dep.") at 12:20-13:7, 105:23-25.

Many of the communications at issue between Fredrikson and JJH occurred through Wedlake

Bell.

## B.  Fredrikson's Preparation of Intent to Use Application

At the time JJH hired Fredrikson, JJH had not used the YES! trademark on any products

sold in the United States.  Therefore, in February 2000, West prepared an application ("Intent to

Use Application") to the U.S. Patent and Trademark Office ("USPTO") based upon JJH's "intent

to use the mark in commerce."  O'Neill Aff. [Docket No. 119], Attach. 6.  Wedlake Bell

suggested six tobacco-related goods to be covered by the Intent to Use Application.  Fredrikson

prepared the Intent to Use Application and suggested adding other tobacco related goods that

JJH might want to cover as well.  In its final form, the Intent to Use Application listed 21

tobacco-related goods.  Attesting to its accuracy, Harry of Wedlake Bell signed the Intent to Use

Application.  Fredrikson filed the Intent to Use Application with the USPTO.  Id., Attach. 8.

In February 2001, the USPTO issued a Notice of Allowance for the YES! trademark for

the 21 tobacco-related goods, including cigarettes, listed in the Intent to Use Application.

Fredrikson sent Wedlake Bell the Notice, reminding JJH that the Intent to Use Application was

filed based on products JJH had not yet used commercially and the Trademark registration would

not issue until JJH filed a Statement of Use.  Id., Attach. 9.  Fredrikson alerted JJH that the

Notice gave six months to file a Statement of Use along with specimens showing how JJH uses

the marks in connection with the goods.  "If JJH has not yet begun using the marks on a

commercial basis, [Fredrikson] can obtain an extension of this deadline (assuming they still

intend to actually use the marks)."  Id.  JJH had Fredrikson file four Requests for Extensions to

File a Statement of Use, all signed by the Wedlake Bell attorney.  Janus Decl., Attach. 1, Ex. B

at 57-63[1]  (McCulloch Dep. Exs. 20, 22 and 23).  Each extension stated: "Applicant has a

continued bona fide intention to use the mark in commerce in connection with those goods

identified in the Notice of Allowance in this application."  Id.

On April 30, 2001, JJH inquired through Wedlake Bell "what exactly constitutes use in

---

[1] With the exception of citations to deposition testimony, all page number citations to the
record refer to the docket page number located at the top of each page.

the USA?"  O'Neill Aff., Attach. 5 at 32 (West Dep. Ex. 145).  On May 9, 2001, Fredrikson

responded:

> The mark is in actual use in commerce if products are transported between states in
> the U.S. or between a U.S. state and a foreign country (i.e. interstate commerce or
> commerce between the U.S. and a foreign country).  Further, the mark must be used
> in the ordinary course of trade in connection with the goods stated in the application,
> rather than merely in attempt to reserve the right to a mark. Thus, for your client's
> purposes, it must have verifiable sales of its tobacco products to its U.S. customers.
> Once use in commerce has begun, we will need to provide the U.S. Trademark
> Office with the date of first use along with a specimen.  A specimen would be a
> label, tag or container for the goods which depicts the mark.

Id. at 33 (West Dep. Ex. 147).

On May 11, 2001, attorneys at Wedlake Bell asked if shipping one container of 10,000

cigarettes to the USA for sale would satisfy the requirement for use, or if a greater volume was

required.  Id. at 36 (West Dep. Ex. 149).  West responded that the volume was sufficient to

constitute "use" when a U.S. customer first purchased a packet of cigarettes, but cautioned,

"please note that this should not be just one singular shipment but rather the beginning of

continuous shipments of the goods which depict the mark[] YES."  O'Neill Aff., Attach. 2 at 8

(McCulloch Dep. Ex. 12).

**C.  Potomac Tobacco Company informs JJH of its intent to challenge YES! trademark**

On June 5, 2002, the Potomac Tobacco Company ("Potomac") contacted JJH by letter

stating it was seeking to register a "YES" trademark in the United States, as it already had the

trademark registered internationally.  Potomac informed JJH that it intended to take legal action

against JJH and its YES! trademark application.  Id. at 10 (McCulloch Dep. Ex. 15).  JJH then

requested Fredrikson's advice on how to proceed.  On June 21, 2002, Fredrikson attorney West

responded.  First, he assured JJH that Potomac would have to wait until JJH's application

4

process was complete before taking legal action against it.  At that point, "to succeed in the

cancellation action, Potomac would have to show that it has superior rights to the mark in the

U.S. or that JJHL committed some type of fraud in obtaining the registration."  Id. at 11

(McCulloch Dep. Ex. 16).  "In that regard, we will want to make sure that we have proper

evidence of JJHL's use of the YES mark in the US so that Potomac cannot later attack the

registration on the basis of use."  Id.

Prior to filing the Statement of Use, Fredrikson never clarified, and JJH never asked,

what was needed beyond what had already been discussed.  JJH and Fredrikson continued to act

as if all that was needed were form filings.  On June 2, 2003, JJH, through Wedlake Bell,

informed Fredrikson it had sold 10.3 million units to its customers in the US and asked about the

"precise nature of the evidence we should submit" for the Statement of Use.  O'Neill Aff.,

Attach. 5 at 43 (West Dep. Ex. 155).  West of Fredrikson responded, "just the packaging."  Id. at

44 (West Dep. Ex. 156).  Fredrikson prepared the Statement of Use form.  The form requires

attesting that the applicant "is using the mark in commerce on or in connection with the

following goods: (check one)

> [Box 1] Those goods identified in the Notice of Allowance in this application.
> [Box 2] Those goods in the Notice of Allowance in this application except:
> (Identify goods to be deleted from application)

Janus Decl., Attach. 1, Ex. B, p. 69 (McCulloch Dep. Exs. 28).  Fredrikson checked Box 1.

Fredrikson sent the form to attorney Harry at Wedlake Bell.  Harry signed the document on

behalf of JJH attesting to the truthfulness of the document as "a person with firsthand knowledge

of the facts" in the application.  Id. at 70.  Hoskins and McCulloch of JJH did not review the

Statement of Use form.  West reviewed and filed the document with the USPTO on August 14,

2003.  At the time the Statement of Use form was submitted, JJH had used the Trademark only on cigarettes.

On February 10, 2004, the USPTO issued a formal registration of the YES! trademark. O'Neill Aff., Attach. 5 at 48 (West Dep. Ex. 179).

**D.  Potomac files Petition to Cancel JJH's YES! trademark**

On March 19, 2004, Potomac filed a Petition to Cancel JJH's YES! trademark registration with the Trademark Trial and Appeals Board ("TTAB") on the basis of fraud.  On May 26, 2004, upon receipt of Potomac's Petition to Cancel, Fredrikson's Dean Karau responded to Wedlake Bell:

> The Statement of Use prepared by Fredrikson & Byron is appropriate in all respects. Rather, the petitioner is challenging whether the client in fact ever used the mark as it averred in the Statement of Use.  If the client used the mark as it averred, then the client should prevail.  As I have discussed previously, the client's first [use] had to have been a legitimate use, not merely a token use intended solely for purposes of obtaining the registration.
>
> The client did not need to have used the mark on all of the products in its application in order to obtain a registration.  Rather, the client only needed to aver to use of the mark in connection with one of the goods.

O'Neill Aff., Attach. 6 at 7 (West Dep. Ex. 185).  Karau further explained that JJH could be vulnerable to partial cancellation for any goods listed where the mark was not used.  JJH told Fredrikson that it had only used the mark on cigarettes.  Id. at 19 (West Dep. Ex. 186).  Karau did not "think that will be a major problem because the focus [of the petition] is on cigarettes." Id.  Even so, Karau directed a summer associate at the firm to research the issue.  On June 9, 2004, the summer associate provided Karau a memo listing cases supporting and opposing Fredrikson's position that JJH did not need to have used the mark on all products listed in its application to obtain a registration.  The summer associate concluded:

> There are approximately the same number of cases falling on both sides of the issue. Most concerning, however, is that the most recent decisions do not support our position. Three cases in the first six months of this year oppose our client's position. Only one decision in the last decade supports our client's position.

Id. at 36 (West Dep. Ex. 191).  On June 10, 2004, Karau asked a senior Fredrikson associate to follow up on the research.  Karau's June 18, 2004 meeting notes indicate that he was concerned about the potential implications of the research.  Karau reminded himself in the notes to check whether JJH informed Fredrikson that it was not using the mark on all the items listed on the application and also to notify Bert Greener, a Fredrikson attorney in the malpractice section, of the situation.

> On August 16, 2004, Fredrikson advised JJH of its concern, explaining:
>
> Potomac will learn that JJ Holand has used its mark in the U.S. only on cigarettes. Based on previous U.S. case law, this likely would not have been a significant problem. Unfortunately, very recent cases . . . lead to a different conclusion and possibly put into jeopardy JJ Holand's YES! registration. . . . Under earlier case law, the TTAB rarely cancelled a trademark registration where the mark was not used on all of the goods listed in a notice of allowance and on which the statement of use was based. . . . However, there have been several cases within the past year where the TTAB has cancelled registrations because the mark at issue has not been used on each and every product listed in the notice of allowance and the associated statement of use.

Janus Decl., Attach. 1, Ex. B, at 72 (McCulloch Dep. Ex. 45).  Fredrikson focused particularly on the decision in Medinol Ltd. v. Neurovasx, Inc., 67 U.S.P.Q.2d (BNA) 1205 (T.T.A.B. 2003), which held that an inaccurate statement of use may be fraudulent and, therefore, the registration may be cancelled, regardless of the intent of the party averring to the use.  Id.  Even so, Fredrikson advised "there is a good basis for challenging this [Medinol] line of cases, should Potomac raise them."  Id.  Fredrikson further advised "there are reasons for JJ Holand to continue to fight against cancellation of its registration.  First, JJ Holand has good equitable

arguments that it did not intend to mislead the USPTO. . . ."  Id.  In October 2004, Fredrikson

sent an e-mail to JJH which included an analysis of the issues and the recent cases Fredrikson

had researched, including a discussion of the Medinol decision, a citation to the decision with the

date of the decision, and citations to other recent TTAB decisions that followed Medinol and

were cited in the summer associate memorandum.  Id. at 75 (McCulloch Dep. Ex. 56).

On October 28, 2004, Fredrikson renewed coverage with its malpractice insurer.

Fredrikson identified its JJH situation as a potential malpractice claim.

In November 2004, Fredrikson provided further analysis and discussion of strategies in

response to questions from JJH, including citations to and discussion of cases that followed

Medinol.  Fredrikson advised:

> Based on the line of recent TTAB cases . . . we continue to believe that Potomac's
> likelihood of success is at least 70%.  As we previously indicated, there are earlier
> TTAB cases which are more favorable. Moreover, the TTAB is guided by decisions
> of the Court of Appeals for the Federal Circuit.  Thus, with further research we may
> be able to craft a successful argument.  For instance, (if it is true) we may be able to
> argue that at the time you executed the Statement of Use, you understood that you
> had to be using the mark on only one of the goods in a class.  In support of that
> position, (again only if it is true) you may have based your belief on the fact that the
> other countries in which you currently have registrations only require use on one of
> the goods in a class.

Janus Decl., Attach. 2 at 77, Ex. I.

**E.  JJH blames Fredrikson for the Statement of Use errors**

As Potomac's Petition to Cancel case was moving forward, JJH and Fredrikson were

exchanging correspondence about fault for the Statement of Use misstatements.  On November

12, 2004, JJH informed its Wedlake Bell attorney Johnathan Cornthwaite that Fredrikson was

responsible for the errors that might allow Potomac to succeed in cancelling JJH's trademark.

On December 9, 2004, Cornthwaite wrote Fredrikson's Karau, relaying a conversation with JJH

managers: "The clients have difficulty in understanding your position that you do not agree that anything had been done incorrectly, and that deficiencies in the Statement of Use were attributable to mis-communication." Janus Decl., Attach. 1, Ex. B, p. 72 (McCulloch Dep Ex. 60). He continued that JJH "could be persuaded to drop any claims for a contribution to the wasted investment" subject to certain payments by Fredrikson. On December 29, 2004, West e-mailed Cornthwaite, expressing regret over the situation but stating:

> We disagree with Mr. Hoskins' statement that his time and effort have been wasted 'as a result of [Fredrikson's] apparent errors/omissions.' The application for the YES! trademark was reviewed and approved by J.J. Holand prior to filing. There were several letters and other communications between [Fredrikson], Wedlake Bell, and J.J. Holand regarding the use of the trademark on several issues but it does not appear that a specific conversation on the use of the mark on all of the goods of the application occurred. Thus, there appear to have been assumptions by all parties that may not have been accurate.

O'Neill Aff., Attach. 6 at 7 (West Dep. Ex. 201). This communication also included a detailed settlement proposal. Id. On January 13, 2005, Wedlake Bell responded to Fredrikson with an alternative settlement proposal to Fredrikson. Janus Decl., Attach. 1, Ex. B, at 72 (McCulloch Dep Ex. 62). In the end, no settlement between JJH and Fredrikson was reached.

**F.  Fredrikson's representation of JJH is terminated**

In May 2005, Fredrikson wrote to JJH that the ongoing settlement discussions relating to the Statement of Use issue created a conflict of interest for Fredrikson's representation of JJH in the cancellation proceeding. Fredrikson explained:

> [JJH's] claim that Fredrikson & Byron is at fault for any potential loss of rights [JJH] may have in the trademark YES! and your request that we indemnify [JJH] against such loss creates a conflict with our ongoing representation of [JJH] and we believe that we can no longer ethically represent you in these matters.

Janus Decl., Attach. 1, Ex. B at 72 (McCulloch Dep. Ex. 69). On June 14, 2005, on behalf of

JJH, a Wedlake Bell attorney wrote to Fredrikson, stating "we have had various discussions and exchanges of correspondence with you with a view to attempting to settle [JJH's] claims relating to its US trade mark registration for 'YES'." He further stated that JJH "is not interested in launching any negligence suit" and that JJH would settle its claims against Fredrikson in exchange for $63,626. Id. at 112 (McCulloch Dep. Ex. 71). JJH did not affirmatively terminate Fredrikson's representation.

On August 23, 2005, Fredrikson sent JJH another settlement proposal. In exchange for JJH's release of Fredrikson from any and all claims it may have against it, Fredrikson offered to waive any unpaid fees. Fredrikson also offered to pay JJH a sum of money and would attempt to secure a quick settlement with Potomac. JJH did not accept this proposal. O'Neill Aff., Attach. 19, Ex. O. On August 30, 2005, Fredrikson informed JJH that any opportunity to settle with Potomac would end within a week. Id. On September 16, 2005, Fredrikson informed JJH that it would move to withdraw from the Potomac litigation if JJH did not terminate Fredrikson's representation within four days. O'Neill Aff., Attach. 20, Ex. P. On September 19, 2005, JJH terminated the attorney-client relationship with Fredrikson.

## G. JJH hires a new attorney

On November 11, 2005, JJH secured alternate counsel, Arash Samadani, for the Potomac litigation. Samadani Decl. [Docket No. 122] ¶ 5. Fredrikson claims it transferred all relevant files to Samadani. Samadani understood from McCulloch at JJH that Fredrikson had advised JJH a year earlier that it "had less than a very little chance of prevailing" against the Petition of Cancellation, and that Fredrikson became "even more pessimistic as time went on." Id. ¶ 9. Samadani ultimately understood that Fredrikson viewed the cancellation as inevitable. Id.

Nevertheless, on March 16, 2006, the TTAB denied Potomac's motion for summary judgment, concluding there was a genuine issue of material fact with respect to JJH's intent to commit fraud on the USPTO.  Id. ¶ 18.  Ultimately, however, JJH decided to not proceed with defending its trademark due to cost and the likelihood of success, as advised by Samadani.  Id. at 20.  Thus, on December 14, 2006, Potomac's Petition for Cancellation was granted and JJH's YES! Trademark registration was cancelled.  Id. ¶ 23.[2]

In 2007, JJH asked attorney Lance Straube to evaluate whether JJH had a malpractice claim against Fredrikson.  Straube received documents from Samadani, but he did not think that he received all of the documents he needed to evaluate the case.  O'Neill Decl., Attach. 24, Ex. T at 2.[3]  In May 2009, Straube contacted Fredrikson.[4]  Fredrikson responded in October 2009, but Straube was not satisfied with what he received.  In November 2009, Straube requested more information and copies of documents he felt were not in the files he received from Samadani.  In December 2009, Fredrikson responded that the relevant files were sent to Samadani.  On October

---

[2] Samadani notes his opinion that Fredrikson "should have plead reliance on advice of counsel as an affirmative defense when preparing JJH's Answer in the Cancellation on June 1, 2004."  Id.  Samadani also notes that "JJH initially believed the court had made an adverse finding against [Fredrikson] and inquired if a malpractice claim existed by defeating the Motion for Summary Judgment, but seemed crestfallen when [he] explained only a question of fact was found, and they still were faced with the legal and financial realities of vigorously defending the cancellation."  Id.  Samadani also warned that he was not a malpractice attorney and did not have sufficient facts to know if there was a malpractice claim.

[3] For example, Straube noted "[t]here are materials in my request for 25th November 2009 which might not have been included in the files transferred to Samadani Law.  For example, phone logs, timesheets, invoices, internal memorandum and research materials/results."

[4] According to the record before the Court, May 2009 is the earliest date Straube contacted Fredrikson about materials he needed to evaluate the malpractice claim.  No explanation has been offered about the considerable lapse of time.  O'Neill Decl., Attach. 24, Ex. T at 2.

18, 2010, Straube received copies of all of Fredrikson's files on the YES! Trademark issue.

JJH filed its malpractice claim against Fredrikson on December 6, 2012.[5]  JJH has now

identified the June 2004 summer associate memorandum as the one document in Fredrikson's

disclosure of documents that it did not have before.  JJH also claims that Fredrikson should have

disclosed the conversations with its in-house malpractice attorneys and insurers in 2003 and

2004.

JJH filed this suit in December 2012 and asserts claims for: (1) legal

malpractice/negligence (Count 1); (2) breach of contract (Count 2); (3) breach of fiduciary duty

(Count 3); (4) negligent misrepresentation (Count 4); (5) intentional misrepresentation (Count

5); and (6) fraudulent concealment/equitable estoppel/tolling of applicable statute of limitation

(Count 6).  Compl. at 11-22.

## III.  DISCUSSION

### A.  Standard of Review

Rule 56(a) of the Federal Rules of Civil Procedure provides that summary judgment shall

be rendered if there exists no genuine issue as to any material fact and the moving party is

entitled to judgment as a matter of law.  On a motion for summary judgment, the court views the

evidence in the light most favorable to the nonmoving party.  Ludwig v. Anderson, 54 F.3d 465,

470 (8th Cir. 1995).  However, the nonmoving party may not "rest on mere allegations or

denials, but must demonstrate on the record the existence of specific facts which create a genuine

issue for trial."  Krenik v. Cnty. of Le Sueur, 47 F.3d 953, 957 (8th Cir. 1995) (citations omitted).

---

[5] Again, no convincing explanation has been offered for the lapse of this considerable
amount of time.

If evidence sufficient to permit a reasonable jury to return a verdict in favor of the nonmoving party has been presented, summary judgment is inappropriate.  Id.  However, "the mere existence of some alleged factual dispute between the parties is not sufficient by itself to deny summary judgment . . . .  Instead, 'the dispute must be outcome determinative under prevailing law.'"  Get Away Club, Inc. v. Coleman, 969 F.2d 664, 666 (8th Cir. 1992) (citations omitted).

**B.  JJH's claims are barred by the Statute of Limitations**

The parties agree that a six-year statute of limitations and Minnesota's accrual rules apply to this case.  See  Minn. Stat. § 541.05, subd. 1(1) and (5).  Because JJH filed this lawsuit on December 6, 2012, any claims that accrued prior to December 6, 2006 are barred by the statute of limitations.

Fredrikson argues JJH's claims are barred because the statute of limitations began to run when Potomac filed its Petition to Cancel on March 19, 2004.  As of March 2004, Fredrikson argues, JJH suffered damage based on Fredrikson's alleged Statement of Use errors, losing the property protection it sought to obtain through the filing of the Statement of Use.  In the alternative, Fredrikson argues that the statute of limitations began to run when JJH hired new counsel in November 2005.

JJH contends that its claims are timely because it did not suffer compensable damage until its YES! Trademark was cancelled on December 14, 2006.  JJH cites three instances of alleged misconduct:  (1) Fredrikson's failure to properly prepare and file the Statement of Use; (2) Fredrikson's failure to disclose its conflict of interest; and (3) Fredrikson's concealment of information from JJH.

Under Minnesota law, the "statute begins to run when the cause of action accrues, that is,

when the plaintiff can allege sufficient facts to survive a motion to dismiss for failure to state a

claim upon which relief can be granted."  Antone v. Mirviss, 720 N.W.2d 331, 335 (Minn. 2006)

(citation omitted).  Minnesota applies the damage rule of accrual, which means "the cause of

action accrues and the statute of limitations begins to run on the occurrence of any compensable

damage."  Id. at 335-36 (also known as the "some compensable damage" rule); Herrmann v.

McMenomy & Severson, 590 N.W.2d 641, 643 (Minn. 1999).[6]  "Furthermore, the statue of

limitations begins to run after damage occurs, even though the ultimate damage is unknown or

unpredictable."  Sabes & Richman, Inc. v. Muenzer, 431 N.W. 2d 916, 918, LEXIS 1153 (Minn.

App. 1988) (citing Dalton v. Dow Chemical Co., 158 N.W. 2d 580, 585 (Minn. 1968)).  When

damage is accrued through distinct acts of malpractice, the statute of limitations for each act

begins to run whenever some damage has accrued as a result of the act in question.  Devereaux

v. Stroup, Minn. App. Unpub. LEXIS 62, *8-10 (Minn. Ct. App. 2008).

Here, Fredrikson argues JJH lost its property rights once the Petition to Cancel was filed

by Potomac in 2004, because at that point JJH could no longer amend the Statement of Use.[7]  To

_____

[6] There are three types of damage-accrual rules. The "some damage" rule represents the
"middle ground."  Antone, 720 N.W.2d at 335.  The other damage-accrual rules are the
"occurrence" rule and the "discovery" rule. Under the occurrence rule, the statue of limitations
begins to run with the performance of a wrongful act.  Id.  Under the discovery rule, the statute
of limitations only begins to run when the plaintiff knows or should know of his or her injury.
Id.

[7] Fredrikson relies on Medinol, Ltd v. Neuro Vasx, Inc., 67 U.S.P.Q. 2d 1205 (BNA)
(T.T.A.B. 2003) for the proposition that amendment of a Statement of Use is not allowed during
a cancellation proceeding.  See Defs.' Mem. Supp. Summ. J. [Docket No. 107] 21.  JJH argues
that In Re: Bose Corp., 580 F.3d 1240, 1245 (Fed. Cir. 2009) overrules Medinol.  Pl.'s Mem.
Opp. Summ J. [Docket No. 118] 35.  Fredrikson agrees, but argues that Bose does not apply
retroactively.  Neither party offers support for their position regarding retroactive application of
Bose.  Based on the Supreme Court's decision in Harper v. Va. Dep't of Taxation, Bose is not to
be applied retroactively to the underlying cancellation proceeding.  509 U.S. 86 (1993) (holding

this end, Fredrikson argues that <u>Antone</u> is dispositive.  <u>Antone</u>, 720 N.W.2d 331.  In <u>Antone</u>, the Minnesota Supreme Court held that a man who signed a negligently drafted antenuptial agreement was injured when the agreement became effective and he lost the ability to unilaterally change the contract to protect his legal rights to his pre-marriage assets.  <u>Id.</u> at 337. The statute of limitations began to run on his malpractice claim for his attorney's failure at the time he signed the agreement, not years later when he discovered the mistake upon filing for divorce.  <u>Id.</u>

JJH argues that this case is distinguishable from <u>Antone</u> because a malpractice suit commenced at the time the Petition to Cancel was filed could not have survived a motion to dismiss.  A legal malpractice claim requires proof of (1) an attorney-client relationship, (2) acts constituting negligence or breach of contract, (3) that such acts were the proximate cause of plaintiff's damages, and (4) but for defendant's conduct, the plaintiff would have been successful in the prosecution or defense of an action.  <u>Blue Water Corp. v. O'Toole</u>, 336 N.W. 2d 279, 281 (Minn. 1983).  In 2004, JJH could have pled enough facts to support these four elements to survive a motion to dismiss.  The attorney-client relationship is not in dispute (element one), JJH could have plausibly alleged that Fredrikson erred when filling out the Yes! Trademark's Statement of Use (element two), Fredrikson's errors were plausibly the proximate cause of JJH's inability to amend the Statement of Use and Potomac's Petition to Cancel (element three) and, but for Fredrikson's errors, no challenge would have been brought against JJH's trademark

---

that when the Supreme Court applies a federal rule of law, the rule is controlling and must be given retroactive effect in all cases still open on direct review).  Here, <u>Bose</u> is not a decision of the United States Supreme Court and the underlying proceeding is no longer open on direct review.

(element four).  Thus, the record supports the conclusion that JJH could have pled a plausible

claim of legal malpractice at the time that Potomac filed its Petition to Cancel.  <u>Bell Atl. Corp. v.</u>

<u>Twombly</u>, 550 U.S. 544, 555, 570 (2007) (holding that under Rule 12(b)(6) of the Federal Rules

of Civil Procedure, a plaintiff's factual allegations must "raise a right to relief above the

speculative level," and push claims "across the line from conceivable to plausible.").

JJH also argues that it was not injured until the trademark was cancelled in December

2006.  However, in <u>Antone</u>, the Minnesota Supreme Court also rejected the argument that "the

seeds of some damage did not ripen until the dissolution of the marriage."  <u>Id.</u>  Rather, the Court

held that "the ability to ascertain the exact amount of damages is not dispositive with respect to

the running of the statute of limitations."  <u>Id.</u>  Thus, although the cancellation of JJH's trademark

is the ultimate damage experienced by JJH, it does not follow that JJH did not experience any

compensable damage prior to final cancellation.  <u>See also</u> <u>Herrmann</u>, 590 N.W. 2d at 644

(holding that in a legal malpractice suit, the statute of limitations began to run at the time of the

first prohibited transaction, not six years later when plaintiff learned of counsel's mistake and

realized its outstanding liability).

JJH's own communications to Fredrikson support the conclusion that it experienced some

compensable damage when Potomac filed the Petition to Cancel.  <u>See</u> McCulloch Dep. Ex. 60

("[JJH has] difficulty in understanding your position that you do not agree that anything had

been done incorrectly, and that deficiencies in the Statement of Use were attributable to

mis-communication," further noting that JJH "could be persuaded to drop any claims for a

contribution to the wasted investment" subject to certain payments by Fredrikson).[8]  Just as

Antone entered his marriage "without the legal shield" he had retained counsel to provide, JJH

proceeded under a faulty Statement of Use that left its trademark vulnerable to attack by

Potomac.  See Antone, 720 N.W.2d at 337.  Unlike Antone, however, JJH became aware of

Fredrikson's alleged malpractice after Potomac filed its Petition to Cancel.  The Petition served

as notice for JJH to file a timely malpractice suit, but JJH chose not to pursue such litigation.

JJH also seeks to distinguish this case from Antone and others where a single incident of

malpractice or negligence occurred.  JJH relies on Devereaux for the proposition that

Fredrikson's "continuing representation and numerous acts of negligence prevent the statute of

limitations from accruing until the date the trademark was cancelled."  Pl.'s Mem. Opp. Summ. J

[Docket No. 118] 37.  However, in Devereaux, the court explicitly declined to apply the

"continuous representation doctrine."  Devereaux, Minn. App. at *9.  Rather, the Court held that

the six-year statute of limitations began running when the plaintiff experienced compensable

damage based on each act of alleged malpractice.  Id.  In this case, even if Fredrikson's alleged

continuous bad counsel, concealment of information and failure to disclose conflicts of interest

were considered separate acts of legal malpractice, JJH's claims would still be barred because all

of these acts are alleged to have occurred prior to December 2006.  See e.g., Janus Decl., Attach.

---

[8] JJH's reliance on Noske v. Friedberg, 670 N.W. 2d 740, 741 (Minn. 2003) for the proposition that "final judgment was necessary before F&B's malpractice became actionable" is not persuasive because Noske addressed the question of whether a criminal defendant's claim for ineffective assistance of counsel accrued at the time of the plaintiff's conviction or when postconviction relief was subsequently granted.  Notably, Antone was decided after Noske and the facts of Antone are more analogous to this case than those of Noske.

1, Ex. B at 72 (McCulloch Dep. Ex. 69).  Moreover, JJH cannot allege that it suffered ongoing

damage based on Fredrikson's errors or omissions past November 2005, the date when it fired

Fredrikson and hired new counsel.  Samadani Decl. ¶ 5.

Assuming without deciding that Fredrikson's alleged errors in relation to the Statement

of Use constitute legal malpractice, the alleged errors occurred more than six years prior to JJH's

filing of this suit and are thus time-barred.

**C.  The Statute of Limitations will not be tolled on the basis of fraudulent concealment**

JJH argues that the statute of limitations should be tolled because Fredrikson "profoundly

shaped JJH's perceptions and actions" by withholding information "well past December 2006,

up to October 2010 and beyond."  Pl.'s Mem. Opp. Summ. J. at 36.  Fredrikson maintains that it

did not conceal any facts that formed the basis of JJH's cause of action.

Minnesota law allows equitable tolling of a statute of limitations when the plaintiff can

"demonstrate that the defendant engaged in fraudulent concealment" of material facts which

would lead to the discovery of the plaintiff's cause of action.  Lamere v. St. Jude Med., Inc., 827

N.W.2d 782, 788 (Minn. Ct. App. 2013) (citing De Cosse v. Armstrong Cork Co., 319 N.W.2d

45, 51-52 (Minn. 1982)).  Fraudulent concealment is a somewhat amorphous doctrine within

equitable tolling jurisprudence.  See Wild v. Rarig, 302 Minn. 419, 450 (1975) ("There is no

categorical definition of what constitutes fraudulent concealment."); see also Abbotts v.

Campbell, 551 F.3d 802, 805 (8th Cir. 2008) (holding Minnesota applies the discovery rule to

allegations of fraud; and, fraudulent concealment of information material to a non-fraud claim

will toll a limitations period).  But, when parties are in a fiduciary or confidential relationship,

fraudulent concealment is established if a defendant denies having, or withholds, material facts

that "lead the potential plaintiff to believe that the facts do not exist or cannot be discovered."

Helleloid v. Indep. Sch. Dist. No. 361, 149 F. Supp. 2d 863, 869 (D. Minn. 2001) (internal

quotation marks omitted) (citing Goellner v. Butler, 836 F.2d 426, 431 (8th Cir. 1988)).[9]  If

established, fraudulent concealment tolls the running of the statute of limitations until "discovery

or reasonable opportunity for discovery of the [existence of a cause of action] by the exercise of

ordinary diligence."  Id.; see also Hydra-Mac, Inc. v. Onan Corp., 450 N.W.2d 913, 918 (Minn.

1990).

Here, the only document that JJH contends Fredrikson did not timely disclose was the

2004 summer associate memorandum.[10]  JJH argues that "[t]he concealment prevented JJH from

obtaining knowledge about the existence of its causes of action against F&B, and prevented JJH

from making informed decisions about the entire Potomac litigation . . . ."  Pl.'s Mem. Opp.

Summ. J. at 41.  However, the record shows that Fredrikson disclosed the substance of the

summer associate memorandum in other 2004 communications.  Specifically, on August 16,

2004, Fredrikson's Karau sent Wedlake Bell's Jonathan Cornthwaite an e-mail to, in part, advise

JJH "of a recent development in Trademark [cases] concerning the use of a trademark for the

purpose of a registration."  See Janus Decl., Attach. 1, Ex. B at 72 (McCulloch Dep. Ex. 45).

---

[9] "[I]n the absence of a fiduciary or confidential relationship, there must be something of an affirmative nature designed to prevent, and which does prevent, discovery of the cause of action."  Wild, 301 Minn. at 450 (quotation omitted); Thunander v. Uponor, Inc., 887 F. Supp. 2d 850, 867 (D. Minn. 2012).

[10] JJH argues that Fredrikson also concealed "hundreds" of pages of relevant legal research, attorney notes and billing statements.  Pl.'s Mem. Opp. Summ. J. at 41.  However, JJH does not explain how knowledge of the material in those additional documents would have altered JJH's decision to not proceed with a malpractice suit against Fredrikson in 2004 when it was fully aware of Fredrikson's alleged errors regarding the Statement of Use.

Karau explained that "there have been several cases within the past year where the TTAB has cancelled registrations because the mark at issue has not been used on each and every product listed in the notice of allowance and the associated statement of use." Id. Karau acknowledged that during discovery Potomac would learn of JJH's use of the trademark on cigarettes only and that, based on the recent case law, JJH's Yes! Trademark may be in jeopardy. Id.

Notably, Potomac filed its Petition to Cancel on March 19, 2004. Fredrikson directed the summer associate to research issues posed by Potomac's challenge on June 9, 2004, and Karau disclosed the relevant substance of that memorandum in a August 2004 communication to Wedlake Bell. Because Fredrikson was not prompted to complete additional legal research relating to the Statement of Use until after Potomac filed its Petition to Cancel, JJH's argument that it was unable to make "informed decisions about the entire Potomac litigation" based on Fredrikson's alleged concealment of the 2004 memorandum is not supported by the record. Regardless, the undisputed evidence shows that Fredrikson shared the substance of the summer associate memorandum with JJH in 2004. For this reason, the statute of limitations will not be tolled.

**D. JJH's objection to Magistrate Judge Leung's July 17, 2014 Order is overruled**

On July 31, 2014, JJH objected to Magistrate Judge Leung's July 17, 2014 Order wherein Judge Leung denied JJH's motion to compel certain documents withheld on the grounds of privilege. Pl.'s Obj. [Docket No. 128].[11] Specifically at issue were documents and deposition answers withheld by Fredrikson (1) on the basis of an intra-firm attorney-client privilege, (2)

---

[11] The Court received and considered the Association of Corporate Counsel's amicus letter in support of JJH's position. See Amicus Letter [Docket No. 140].

concerning self-reporting of malpractice to its malpractice carrier, and (3) e-mails referring to an undisclosed conflict of interest pertaining to the representation of cigarette manufacturers. See Ord. [Docket No. 111] 2.  The undersigned agrees with Judge Leung's thoughtful reasoning and his thorough review of the relevant case law will not be repeated here.  JJH's objection to Judge Leung's July 17, 2014 Order is therefore overruled.[12]

## IV.  CONCLUSION

Based upon the foregoing, and all the files, records, and proceedings herein, **IT IS HEREBY ORDERED** that:

1.     Defendants Fredrikson & Byron, P.A., Dean R. Karau, and David C. West's Motion for Summary Judgment [Docket No. 105] is **GRANTED**;

2.     Plaintiff J.J. Holand's Objection [Docket No. 128] to Magistrate Judge Tony N. Leung's July 17, 2014 Order [Docket No. 111] is **OVERRULED.**

**LET JUDGMENT BE ENTERED ACCORDINGLY.**

BY THE COURT:


_____s/Ann D. Montgomery_____
ANN D. MONTGOMERY
U.S. DISTRICT JUDGE

Dated:  October 16, 2014.

---

[12] Even if the Court were to agree with JJH that communications Fredrikson had with its in-house counsel and malpractice carrier were not privileged, it does not follow that fraudulent concealment would be found and the statute of limitations tolled.  As established supra, JJH had sufficient information to know that it had a viable malpractice claim against Fredrikson based on 2004 communications directly between the parties.  See e.g., Helleloid, 149 F. Supp. 2d at 869 (holding that fraudulent concealment is established if a defendant denies having, or withholds, material facts that "lead the potential plaintiff to believe that the facts do not exist or cannot be discovered.").